**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| MARIA CAMILA VALENCIA RIOS, AQUARIUS FILALI, and NADJI FILALI *on behalf of themselves and all similarly situated individuals*, Plaintiff, v. BELVEDERE NRDE, LLC, PEGASUS RESIDENTIAL, LLC, and GLENMOOR OAKS NRDE, LLC Defendants. | Civil Action No. 3:25-cv-00474-REP |

**<u>DEFENDANT PEGASUS RESIDENTIAL, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS COUNT I OF THE AMENDED COMPLAINT UNDER FEDERAL RULE 12(b)(6)</u>**

Defendant Pegasus Residential, LLC ("Pegasus"), by counsel and pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, files this Memorandum in Support of its Motion to Dismiss the claims brought by Maria Camila Valencia Rios, Aquarius Filali, and Nadji Filali (collectively, "Plaintiffs") on behalf of themselves and a putative class of tenants against Pegasus, Belvedere NDRE, LLC ("Belvedere LLC"), and Glenmoor Oaks NRDE, LLC ("Glenmoor LLC") (collectively, "Defendants"). The Court should dismiss Plaintiffs' claim against Pegasus in Counts I under the Virginia Consumer Protection Act ("VCPA") for the reasons discussed below.

**<u>INTRODUCTION</u>**

Rios is a resident at The Belvedere, an apartment complex owned by Belvedere LLC and managed by Pegasus. She signed a Lease Agreement to rent an apartment at The Belvedere in March 2024 and renewed that Lease in May 2025. *See* Rios's Original Lease Agreement, attached as **<u>Exhibit 1</u>**; Rios's Renewal Lease Agreement, attached as **<u>Exhibit 2</u>**. The Filalis are residents at

Glenmoor Oaks, an apartment complex owned by Glenmoor LLC and managed by Pegasus. They signed a Lease Agreement to rent an apartment at Glenmoor Oaks in October 2024. *See* Filali's Lease Agreement, attached as **Exhibit 3**.[1]

Plaintiffs' predominant claims concern three fees that were fully disclosed in their Lease Agreements: a Pest Fee, a Community Fee, and an Administration Fee.[2] Plaintiffs contend that the Pest and Community Fees are illegal attempts to waive the statutory warranty of habitability found in the Virginia Residential Landlord Tenant Act ("VRLTA"). They claim that by including these fees in the Lease Agreement, Pegasus misrepresented "the nature of the lease transaction" by representing that tenants must pay additional costs for services covered by the statutory warranty of habitability: pest control and maintenance of common areas. ECF No. 30, at ¶¶ 43, 50. Plaintiffs also claim that Pegasus "misrepresented" the Administration Fee "when no provision of the form lease agreements authorized the collection of such a fee from them." *Id*., at ¶ 115. Plaintiffs contend that Pegasus misrepresented these fees in violation of the VCPA. Plaintiffs are wrong.

Pegasus disclosed the Pest Fee and the Community Fee in Plaintiffs' Lease Agreements. It disclosed the amount of the fees, what the fees covered, and (in the case of the Pest Fee) how the fee was calculated. Pegasus fully disclosed the Administration Fee in Plaintiffs' lease applications, which Plaintiffs signed acknowledging that the fee would be paid upon execution of their Lease

---

[1] While Plaintiffs' claims hinge on supposed misrepresentations in their lease agreements, they do not attach copies of those agreements to the Amended Complaint. That omission is telling. As discussed below, the plain language of these lease agreements belies many of Plaintiffs' allegations in the Amended Complaint. This Court may take judicial notice of the lease agreement because it is integral to the Complaint and has been authenticated. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016) (stating that a District Court can consider matters from outside the four corners of the Complaint if they are "integral to the complaint and authentic.") (citation omitted).

[2] Plaintiffs refer to these fees interchangeably as Administration Fees or Move-In Fees in the Amended Complaint. We refer to them herein as Administration Fees.

Agreements. Plaintiffs fail to show that Pegasus made ***any*** misrepresentations of fact concerning these fees when they disclosed them.

Lacking any misrepresentation on which to rely, Plaintiffs try several other ways to fit their claims under the VCPA. Their core argument is that a landlord illegally waives the statutory warranty of habitability found in the VRLTA when it passes any costs relating to duties under the warranty of habitability to its tenants. Plaintiffs offer no support for this proposition under Virginia law. Instead, they attempt to stretch the Virginia Court of Appeals' decision in *Parrish v. Vance*, 898 S.E.2d 407 (Va. Ct. App. 2024) well past the holding in that case. *Parrish* simply does not stand for the maximalist position Plaintiffs claim it does, and the facts of that case are ***far*** different from those at issue here.

Furthermore, the plain text of Plaintiffs' Lease Agreements belie any claim that Defendants sought to waive their duties under the statutory warranty of habitability. To the contrary, they expressly assumed those duties—including the duties to maintain common areas and manage pest control—and reserved rights in the Lease Agreements to help them carry out those duties.

Plaintiffs also try out several new arguments to fit their VRLTA-based claims under the rubric of the VCPA. None of those arguments work. For example, they offer fact-free conclusions that Pegasus never intended to provide the services covered by the fees. The conclusory nature of this allegation aside, it is undermined by Plaintiffs' allegation that Pegasus has contracts with pest control vendors.[3] Additionally, by complaining that the Pest Fee does not reflect the actual costs of pest control services, Plaintiffs acknowledge that those services were actually performed. This

---

[3] It would make little sense for Pegasus to enter into contracts with pest control companies to provide services at facilities in Virginia if Pegasus lacked the intent to actually provide those services.

and Plaintiffs' other allegations fail to identify the misrepresentation necessary to state a claim under the VCPA.

Finally, the private right of action in the VCPA does not apply to "any aspect of a consumer transaction that is subject to the Virginia Residential Landlord Tenant Act . . . unless the act or practice of a landlord constitutes a misrepresentation or fraudulent act or practice" as defined in the VCPA. Va. Code Ann. § 59.1-199(5). Plaintiff accuses Pegasus of misrepresenting the "nature of the *lease transaction*" by charging Pest and Community Fees that supposedly violate the VRLTA. *See* ECF No. 30, at ¶¶ 43, 50 (emphasis added). As described more below, Plaintiffs' claims hinge on the existence of the warranty of habitability. That warranty only exists in Virginia by virtue of the VRLTA. Although Plaintiffs try to qualify for the exception to the exclusion by claiming various misrepresentations in the Lease Agreements under the VCPA, as noted above, they fail to plausibly allege any such misrepresentations. Accordingly, Plaintiffs' claims are "subject to" the VRLTA and barred by the exclusion in Virginia Code Ann. § 59.1-199(5).

## STATEMENT OF MATERIAL FACTS

### *The Apartment Complexes, The Plaintiffs, and Their Lease Agreements*

Belvedere LLC owns The Belvedere, a multi-unit apartment complex in Bon Air, Virginia. ECF No. 30, at ¶ 10. Pegasus manages The Belvedere. *Id.* On March 9, 2024, Rios signed a Lease Agreement to rent an apartment at The Belvedere. *Id.*, at ¶ 25; *see* Exh. 1, at p. 1. On or around June 18, 2025, Rios renewed her lease by entering into a new Lease Agreement. ECF No. 30, at ¶ 25; *see also* Exh. 2. Aside from an increase in the Community Fee from $23 per month to $34 per month, the terms of Rios's original and renewal Lease Agreements are the same. ECF No. 30, at ¶ 30.

Glenmoor LLC owns Glenmoor Oaks, a multi-unit complex in Moseley, Virginia. *Id.*, at ¶¶ 10, 32–33. Pegasus manages Glenmoor Oaks. *Id.*, at ¶ 33. On October 25, 2024, the Filalis executed a Lease Agreement to rent an apartment at Glenmoor Oaks. *Id.*, at ¶ 34; *see also* Exh. 3, at p. 96. Their Lease Agreement follows the same form as Rios's Lease Agreements. The only material difference is that the Filalis agreed to a flat monthly Pest Fee of $6 and a monthly Community Fee of $28. ECF No. 30, at ¶ 37–38; Exh. 3, at pp. 68, 103.

Plaintiffs were charged Administration Fees when they executed their Lease Agreements. Rios was charged a $250 Administration Fee. ECF No. 30, at ¶¶ 26, 31; Exh. 1, at p. 37 (Rios's lease application disclosing that a "leasing administration fee of $250.00 [was] due upon lease execution."). Filali was charged a $300 Administration Fee. ECF No. 30, at ¶ 39; Exh. 3, at p. 4 (Filali's lease application disclosing that a "leasing administration fee of $300.00 [was] due upon lease execution.").[4]

### *Key Provisions in Plaintiffs' Lease Agreements*

Plaintiffs' Lease Agreements all follow the same form.[5] With the exception of dollar amounts, the provisions of all of the Plaintiffs' Lease Agreements are essentially the same. There are several provisions of note in those Lease Agreements.

---

[4] Plaintiffs allege that Ms. Rios was charged a $250 "Move In" fee *and* a separate $300 "Administration" fee. ECF NO. 30, at ¶¶ 26, 31. They also allege that Filali was charged a $300 "Move In" fee *and* a separate $300 "Administration" fee. *Id.*, at ¶¶ 35, 39. Plaintiffs' counsel recently confirmed that these allegations are incorrect. Instead, Rios was charged one $250 "Administration" fee and Filali was charged one $300 "Administration" fee. The facts relayed above reflect Plaintiffs' correction.

[5] Because the Lease Agreements are materially similar and follow the same form, we will excerpt the provisions from Rios's original Lease Agreement (Exhibit 1) above. However, we include citations to all three Lease Agreements so the Court can easily locate the applicable provision in each agreement.

First, the Lease Agreements invoke the landlord's duty to maintain certain areas and equipment in "good and safe condition" and to address "conditions materially affecting the health or safety of ordinary persons":

> **26. CONDITION OF THE PREMISES AND ALTERATIONS.**
> Except for our duty to maintain in good and safe condition all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities, and, except for conditions materially affecting the health or safety of ordinary persons, you accept the apartment, fixtures, and furniture as is. You'll be given an Inventory and Condition form on or before move-in. Within 5 days after move-in, you must note on the form all defects or damage and return it to

Exh. 1, at p. 4, ¶ 26; *see also* Exh. 2, at p. 4, ¶ 26; Exh. 3, at p. 99, ¶ 26.

The Lease Agreements also include a section entitled "Responsibilities of Owner." Exh. 1, at p. 5, ¶ 32; Exh. 2, at p. 8, ¶ 32; Exh. 3, at p. 100, ¶ 32. That section sets forth various duties the landlord agrees to assume under the lease. Those duties include:

> **32. RESPONSIBILITIES OF OWNER.**   We'll act with customary diligence to:
> (1) keep common areas reasonably clean and in a structurally safe condition, subject to paragraph 26 (Condition of the Premises and Alterations);
> (2) maintain fixtures, furniture, hot water, heating and A/C equipment;
> (3) comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing; and
> (4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.
>
> If we violate the above, the following remedies apply:
>
> (a) you must make a written request for repair or remedy of the condition, and all rent must be current at the time;
> (b) after receiving the request, we have a reasonable time to repair, considering the nature of the problem and the reasonable availability of materials, labor, and utilities;
>
> If we fail to remedy the condition within a reasonable time, you may exercise any other remedies provided under Virginia law, including but not limited to Virginia Code Section 55.1-1244.1, as amended.

*Id*.

All three Lease Agreements also include a state-mandated disclosure form prepared by the Virginia Department of Housing and Community Development. Exh. 1, at pp. 71–75; Exh. 2, at pp. 19–24; Exh. 3, at pp. 72–77; *see also* Va. Code Ann. § 55.1-1204(B) (mandating the disclosure). That document sets forth details concerning the statutory warranty of habitability. *See* Exh. 1, at p. 72; Exh. 2, at p. 20; Exh. 3, at p. 73. The disclosure contains the following statements about the statutory warranty of habitability:

> **Fit and Habitable Premises:**
> A tenant has the right to a fit and habitable rental unit in accordance with the Uniform Statewide Building Code. The landlord must make all repairs needed to keep premises fit and habitable. (§55.1-1220) To enforce the right to get repairs, a tenant must be current in rent, give the landlord written notice and wait a reasonable period. If repairs are not made, a tenant can file a Tenant's Assertion in General District Court. This must be filed no later than five days after rent is due. There is no rent withholding in Virginia, except under repair and deduct. (§55.1-1244)
>
> **Uninhabitable Dwelling Unit at Move In:**
> If, at the beginning of the tenancy, there exists a fire hazard or a serious threat to the life, health or safety of the tenant (such as an infestation of rodents or a lack of heat, hot or cold running water, electricity, or adequate sewage disposal facilities), the tenant may terminate the rental agreement and receive a full refund of all deposits and rent paid to the landlord. To terminate the agreement and request a refund, the tenant must provide a written notice of termination no later than seven days after the tenancy started. If, upon receipt of notice, the landlord agrees such hazardous condition exists, the landlord must refund all deposits and rent paid within 15 business days of being notified or of the tenant vacating the unit, whichever occurs later. (§55.1-1234.1).

*Id*.

In her Lease Agreements, Rios agreed to pay a monthly Pest Fee ($9.00 per month) and Community Fee ($23.00 per month). ECF No. 30, at ¶¶ 28–29; Exh. 1, at pp. 8, 10; Exh. 2, at pp. 11–12. The Community Fee increased to $34.00 per month when Rios renewed her lease in 2025. ECF No. 30, at ¶ 30; Exh. 2 at p. 11. Meanwhile, the Filalis agreed to pay a monthly Pest Fee of $6.00 and a monthly Community Fee of $28.00. ECF No. 30, at ¶¶ 37–38; Exh. 3, at pp. 68, 103.

The Pest Fee appears in the Utility Addendum of all three Lease Agreements. ECF No. 30, at ¶¶ 28, 37; Exh. 1, at p. 10; Exh. 2, at p. 12; Exh. 3, at p. 68. The provision regarding "Pest Control" states that a pest control provider bills the landlord directly for pest control services, who

then allocates those costs to the tenant through a flat monthly fee. Exh. 1, at p. 10; Exh. 2, at p. 12; Exh. 3, at p. 68. The Lease Agreement identified several options for the landlord to choose from to allocate the costs of the services in the Utility Addendum:

METERING/ALLOCATION METHOD KEY
"1"  - Sub-metering of all of your water/gas/electric use
"2"  - Calculation of your total water use based on sub-metering of hot water
"3"  - Calculation of your total water use based on sub-metering of cold water
"4"  - Flat rate per month
"5"  - Allocation based on the number of persons residing in your dwelling unit
"6"  - Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7"  - Allocation based on square footage of your dwelling unit
"8"  - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit
"9"  - Allocation based on the number of bedrooms in your dwelling unit
"10"- Allocation based on a lawful formula not listed here
      (Note: if method "10" is selected, a separate sheet will be attached describing the formula used)

Exh. 1, at p. 11; Exh. 2, at p. 13; Exh. 3, at p. 69.

By choosing to allocate the costs of pest control based on a monthly flat rate (Option 4), Pegasus opted not to bind itself to allocating the costs based on per-tenant usage, per-unit usage, square footage, or other factors. The addendum adds that if the landlord chooses the "flat fee method" then, "Resident and Owner agree that the charge indicated in this Agreement . . . represents a **fair and reasonable amount** for the service(s) provided and that the amount billed is **not based on a monthly per unit cost**." *Id*. (emphasis added). The addendum also states that "[u]nder **any allocation method**, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees." *Id*. (emphasis added).

The Community Fee appears in a "Special Provisions" section of the Plaintiffs' Lease Agreements. ECF No. 30, at ¶¶ 22, 29; Exh. 1, at p. 8; Exh. 2, at p. 11; Exh. 3, at p. 103. Each special provision states that tenants are "responsible for and required to pay a 'community fee' . . . plus utilities as outlined on the Utility Addendum each month as additional Rent, which 'community fee' is charged to you for the oversight of potential or current amenities, building maintenance, and all programs deemed necessary by ownership and management as applicable to you, regardless of the state of operation of such amenities or program." *Id*.

8

Rios's lease application includes a Statement of Rental Policy, which states that Rios owed a "leasing administration fee of $250.00 due upon lease execution." Exh. 1, at p. 45. Rios acknowledged that fee when she signed her Lease Application on February 26, 2024. *Id*., at p. 46.

The Filali's lease application includes the same Statement of Rental Policy, which states that the Filalis would owe a "leasing administration fee of $300.00 due upon lease execution." Exh. 3, at p. 4. The Filalis acknowledged that fee when they signed the lease application on October 21, 2024. *Id*., at p. 7.

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure empowers this Court to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, [a plaintiff's] factual allegations, taken as true, must 'state a claim to relief that is plausible on its face.'" *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017) (quoting *Robertson v. Sea Pines Real Estate Co.*, 679 F.3d 278, 288 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009))). "The plausibility standard is not a probability requirement, but 'asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Id*. (quoting *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). While the pleading need not contain "detailed factual allegations," it must contain "more than mere labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

## ARGUMENT

### A.    Plaintiff fails to allege any misrepresentations to support a claim under the VPCA.

The VCPA prohibits a "supplier" from using "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-

200(A)(14). To state a claim under the VCPA, Plaintiffs must allege, with particularity: "(1) fraud, (2) by a supplier, (3) in a consumer transaction." *Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731, 741 (E.D. Va. 2010) (citations omitted).[6] "[A] misrepresentation of fact is a necessary element of proof" to support a VCPA claim. *Lambert v. Downtown Garage, Inc.*, 553 S.E.2d 714, 716 (Va. 2003); *see also Galloway v. Priority Imps. Richmond, LLC*, 426 F. Supp. 3d 236, 244 (E.D. Va. 2019) ("To state a claim under the VCPA, a plaintiff must allege a fraudulent misrepresentation of fact.").

Plaintiffs fail to state a plausible claim for relief under the VCPA concerning any of the disputed fees. We first address the Pest Fee and Community Fees together—along with Plaintiffs' various allegations concerning those fees. We then turn to the Administrative Fee.

### 1. The Pest Fee and Community Fee.

Plaintiffs do not allege that Pegasus charged them more than the monthly fees disclosed in the Lease Agreements. Instead, Plaintiffs try several arguments to transform these disclosed fees into express or implied misrepresentations. Those arguments fail.

### a. The Pest and Community Fees do not waive the statutory warranty of habitability in the VRLTA.

Plaintiffs claim that the Pest Fee "misrepresents the nature of the lease transaction in representing that tenants must pay an additional cost in order to . . . secure a right to a pest-free premises." ECF No. 30, at ¶ 43. They also claim that the Community Fee "misrepresents the nature of the lease transaction in representing that tenants must pay an additional cost in order to . . . secure a right to properly maintained common spaces[.]" *Id.*, at ¶ 50. Plaintiffs argue that both

---

[6] For the purposes of this Motion to Dismiss only, Pegasus does not contest that it qualifies as a "supplier" under the VCPA, or that its dealings with Plaintiff qualify as a "consumer transaction." Pegasus also does not contest that Plaintiff has pled her claims of fraud with particularity as required under Rule 9(b) of the Federal Rules of Civil Procedure.

rights are already secured by the statutory warranty of habitability. *Id*., at ¶¶ 4, 43, 48, and 50. Therefore, they argue that a landlord's attempt to charge any fees for services relating to the statutory warranty of habitability is illegal *per se*—even if the fees are disclosed in the lease.

Defendants attacked the lack of authority for this maximalist position in their Motions to Dismiss Rios's original Complaint. Despite the opportunity to amend and address this issue, Plaintiffs continue to rely exclusively on the Court of Appeals decision in *Parrish* to support their position. But Plaintiffs ask this Court to extend the decision in *Parrish* much farther than that decision allows.

*Parrish* concerned a dispute between a landlord and a tenant over a flea infestation. When the landlord failed to fix the infestation, the tenant sought to terminate her lease under Virginia Code Ann. § 15.1-1244. *Parrish*, 898 S.E.2d at 413. The landlord relied on the terms of the lease agreement which said that the tenant was "responsible for eliminating household pests" once she "took possession of the property." *Id*., at 411. The relevant provision of the agreement stated the following:

> Tenant shall be responsible for . . . [c]ontrolling and eliminating household pests including but not limited to fleas, ticks, bed bugs, roaches, silverfish, ants, crickets, and rodents during occupancy. Tenant shall be responsible for the costs of the elimination of all such pests and vermin during occupancy and upon vacating Premises.

*Id*. (bracketed language in original).

The Virginia Court of Appeals addressed three questions to decide whether the landlord could rely upon that provision to defeat the tenant's claim: (1) whether a lease agreement can "waive rights or remedies made non-waivable by statute"; (2) whether the statutory warranty of habitability is "made non-waivable by statute"; and (3) whether the lease agreement at issue purported to waive the warranty of habitability.

The Court of Appeals answered the first question in the negative by relying upon the prohibition in Virginia Code Ann. § 55.1-1208 that makes unenforceable any provisions in a lease agreement in which a tenant agrees "to waive or forgo rights and remedies under this chapter." *Id*. Next, the court concluded that the statutory warranty of habitability is one of those rights "made non-waivable by statute." *Id*. It noted that although the statute containing the warranty allows landlords to shift certain duties called for in that statute to tenants by agreement (*see* Va. Code Ann. § 55.1-1220(D)), the warranty of habitability is not among them. *Id*., at 412–13. Finally, the court concluded that the lease agreement illegally shifted "the burden to deal with insect infestations" to the tenant. *Id*., at 413.

*Parrish* might be relevant if the Plaintiffs' Lease Agreements stated that Defendants will not take any action to prevent or address pests, or make the tenants responsible for engaging a pest control company and paying the entire cost of that company's services. *Parrish* might apply if Plaintiffs' Lease Agreements disclaimed Defendants' duties to maintain common areas at The Belvedere and Glenmoor Oaks. However, Plaintiffs' Lease Agreements do the opposite. They clearly identify Plaintiffs' rights and Defendants' responsibilities under the statutory warranty of habitability. They also clearly state that Defendants assume those duties—including pest control and the maintenance of common areas—and reserve the right to take certain actions necessary to carry out those duties.

<u>First</u>, contrary to Plaintiffs' allegation in the Amended Complaint,[7] the Lease Agreements specifically identify Plaintiffs' rights and Defendants' responsibilities under the statutory warranty of habitability. Specifically, the Lease Agreement includes the statement of rights and responsibilities required by Virginia Code Ann. § 55.1-1204(B). *See* Exh. 1, at pp. 71–75; Exh. 2,

---

[7] *See* ECF No. 30, at ¶ 72.

at pp. 19–24; Exh. 3, at pp. 72–77. That document informs the tenant that a lease cannot waive "a tenant's rights under the law." Exh. 1, at p. 71; Exh. 2, at p. 19; Exh. 3, at p. 72. It then describes some of those rights, including the statutory warranty of habitability. Exh. 1, at p. 72; Exh. 2, at p. 20; Exh. 3, at p. 73.

Second, the Lease Agreements are clear that Defendants assume the duties of the statutory warranty of habitability. Paragraph 26 of the Lease Agreements states that it is the landlord's duty to "maintain in good and safe condition all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities" or to address "conditions materially affecting the health or safety of ordinary persons[.]" *Id*. This language tracks the requirements in the statutory warranty of habitability. *See* Va. Code Ann. § 55.1-1220(A)(1), (4).

Paragraph 32 of the Lease Agreements commits the Defendants to even more of the duties set forth in the statutory warranty of habitability. It states that the landlord promises to "keep common areas reasonably clean and in a structurally safe condition. Exh. 1, at p. 5, ¶ 32; Exh. 2, at p. 8, ¶ 32; Exh. 3, at p. 100, ¶ 32; compare Va. Code Ann. § 55.1-1220(A)(3) (containing this requirement in the statutory warranty of habitability). It commits the landlord to "maintain fixtures, furniture, hot water, heating, and A/C equipment." Exh. 1, at p. 5, ¶ 32; Exh. 2, at p. 8, ¶ 32; Exh. 3, at p. 100, ¶ 32; compare Va. Code Ann. §§ 55.1-1220(A)(4), (7). It binds the landlord to "comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing." Exh. 1, at p. 5, ¶ 32; Exh. 2, at p. 8, ¶ 32; Exh. 3, at p. 100, ¶ 32; compare Va. Code Ann. §§ 55.1-1220(A)(1), (2), (3), (4), (5), and (6). Finally, it also states that the landlord will make disclosures concerning mold and the tenant's rights, and commits to repair or remediate mold upon notice from the tenant. Exh. 1, at pp. 16–17 (Mold Addendum); Exh. 2, at pp. 25–26 (same); Exh. 3, at pp. 89–90 (same); *compare* Va. Code Ann. § 55.1-1220(A)(5).

Third, the Lease Agreements clearly state that the landlord is responsible for ensuring a pest-free dwelling and engaging the necessary pest control services. The Utility Addendum makes the landlord responsible for engaging third parties to provide pest control services at the apartment complex. Exh. 1, at p. 10; Exh. 2, at p. 12; Exh. 3, at p. 68. The pest control provider sends the pest control bills to the landlord, who then allocates those costs to the tenant through a flat fee. *Id.*

Not only does the landlord take responsibility for engaging pest control services, but the Lease Agreements also reserve the landlord's right to inspect and treat tenants' units for infestations. For example, the landlord has the right to access units to "conduct extermination operations in Residents' dwellings several times a year as needed to prevent insect infestation." Exh. 1, at p. 21, § VIII; Exh. 2, at p. 30, § VIII; Exh. 3, at p. 80, § VIII. The landlord also reserves the right to inspect and treat units for bedbugs. Exh. 1, at p. 13, ¶ 5 (Bed Bug Addendum); Exh. 2, at p. 16, ¶ 5; Exh. 3, at p. 86, ¶ 5. In fact, the Bed Bug Addendum to all three Lease Agreements explicitly directs tenants *not* to "treat the dwelling for a bed bug infestation" on their own. *Id*. This is a far cry from the "handle it yourself" approach dictated by the lease terms in *Parrish*.

There is simply no similarity between the lease agreement at issue in *Parrish* and those at issue here. The landlord in *Parrish* completely abdicated all responsibility for pest control and shifted that responsibility, along with all associated costs, onto his tenant. Here, Defendants affirmatively assume the duty to inspect for and treat pests and perform extermination (preventative and reactive); limit tenants' ability to treat for certain infestations; handle engaging pest control companies to perform those services; and charge tenants a monthly flat fee. They also affirmatively assume the duty to maintain and provide other requirements of the statutory warranty of habitability—including the maintenance of common areas. Defendants' express assumption of

14

these duties in the Lease Agreement disproves Plaintiffs' claim that Defendants attempted to waive the warranty of habitability.

Aside from their inapt comparison to *Parrish*, Plaintiffs offer no authority for the proposition that a landlord waives the warranty of habitability by charging ***any*** fee for providing services relating to the warranty of habitability. Pegasus's counsel has found none. On the contrary, there is ample authority stating that landlords *can* pass along the costs of services necessary to maintain a fit and habitable residence to tenants without abdicating the landlord's duties under the warranty of habitability.

For example, a landlord must supply water, arrange for trash collection and removal, and ensure "safe working order and condition of all electrical, plumbing, sanitary, heating, ventilating, air-conditioning, and other facilities and appliances, including elevators" as part of the duties under the warranty of habitability. Va. Code Ann. §§ 55.1-1220(4), (6), (7).  Still, the VRLTA allows landlords to pass these costs to tenants. In some instances, landlords may pass "service charges" assessed by electricity, oil, natural gas, water, and sewer utilities onto tenants. Va. Code Ann. § 55.1-1212(C). In other instances, landlords can allocate among tenants the "actual or anticipated water, sewer, electrical, oil, or natural gas billings billed to the residential building owner from a third-party provider of the utility service." *Id*., at § 55.1-1212(D). Additionally, "in lieu of increasing rent," the statute allows landlords to utilize a "mathematical formula" to allocate actual or anticipated "local government fees" (to include trash collection, elevator testing, and fire and safety testing) onto tenants as well. *Id*., at § 55.1-1212(H).

It would be a strange state of affairs if a landlord could pass the costs of providing crucial services like water, gas, and trash removal onto her tenants without running afoul of the warranty of habitability, but that same landlord would face legal sanction if she passed the modest cost of

pest control onto her tenants. That is clearly not what the Court of Appeals held in *Parrish*. Rather, that case stands for the simple, non-controversial proposition that a landlord cannot abdicate all responsibility for pest control or other incidents of the warranty of habitability. It does not hold that landlords are prohibited from passing any of the costs of performing their duties under the warranty of habitability onto their tenants. Virginia law makes it clear that landlords can do just that without violating or waiving the warranty of habitability.

### b.   Plaintiffs fail to identify any misrepresentations of fact concerning the Pest Fee or the Community Fee in the Lease Agreements.

"To state a claim under the VCPA, a plaintiff must allege a fraudulent misrepresentation of fact." *Galloway*, 426 F. Supp. 3d at 244. Plaintiffs fail to identify any misrepresentations of fact in the disclosures of the Pest Fee and the Community Fee in the Lease Agreements.

They do not allege that the Pest Fee covered something other than the costs of pest control. To be sure, Plaintiffs quibble about whether Defendants provided the pest control services covered by the Pest Fee and complain that the fees do not align with the costs of the service.[8] Nonetheless, Plaintiffs acknowledge that the Pest Fee was related to pest control. They do not identify any misrepresentations of fact in the Utility Addendum that disclosed the Pest Fee.

Aside from pure legal conclusions, Plaintiffs do not offer any facts to suggest that the disclosure of the Community Fee in the "special provision" contains any misrepresentations of fact, either. Instead, Plaintiffs complain that the "special provision" was too vague and "many of the services that for [*sic*] which tenants pay through the community fee are undisclosed and arbitrability decided by Defendants." ECF No. 30, at ¶ 51.

However, the VCPA applies only to affirmative misstatements or concealments of facts. The statute is not a vehicle for Plaintiffs to quibble about whether a disclosure was too vague.

---

[8] We address these arguments in sections (c) and (d), respectively, below

Indeed, "a violation of the [VCPA] founded upon the nondisclosure of a material fact also requires evidence of a knowing and deliberate decision not to disclose the [material] fact." *Lambert v. Downtown Garage*, 553 S.E.2d 714, 718 (Va. 2001). Plaintiffs fail to identify (with particularity) the material fact concerning the Community Fee Pegasus failed to disclose in the special provision—let alone facts to plausibly establish that Pegasus knowingly and deliberately chose not to disclose that fact.

Lacking any particularized misrepresentations, Plaintiffs claim that the Pest and Community Fees "should have been covered" by Plaintiffs' "rent." ECF No. 30, at ¶ 62. However, the Lease Agreements explicitly stated that these fees were charged as additional rent:

> "In addition to Rent set forth in Section 6, you are responsible for and required to pay a "***community fee***" . . . ***plus utilities outlined on the Utility Addendum*** each month as ***additional Rent***[.]"

Exh. 1, at p. 8; Exh. 2, at p. 11; Exh. 3, at p. 103 (emphasis added). If Plaintiffs' contention is that Defendants misrepresented the fees by failing to include them as an item of "rent," the plain text of the Lease Agreements defeats that claim.

### c.    Plaintiffs fail to plausibly allege that Pegasus lacked the intent to provide the services covered by the Pest and Community Fees.

Plaintiffs also claim that Pegasus "did not intend—and never intended at the time they had Plaintiffs and the class members execute their lease agreements—to provide the promised services[.]" ECF No. 30, at ¶ 61. They provide no facts to support these legal conclusions. The Court is not bound to accept such fact-free legal conclusions. *See Mastin v. Ditech Fin., LLC*, No. 3:17-cv-368, 2018 U.S. Dist. LEXIS 11029, at *7 (E.D. Va. Jan. 23, 2018) ("A court need not . . . 'accept the legal conclusions drawn from the facts' or accept as true any inferences, conclusions or arguments.") (quoting *Eastern Shores Mkts., Inc. v. J.S. Assoc. Ltd. P'Ship*, 213 F.3d 175, 180 (4th Cir. 2000)). In any event, Plaintiffs fail to allege facts to plausibly establish that Pegasus

lacked the intent to provide the services covered by the fees when it signed the Lease Agreements. In fact, Plaintiffs' allegations undermine that claim.

Their admission that "Defendants all contract with various pest control companies for fixed, yearly charges" belies the claim that Pegasus had no intention of providing pest control services when it executed the Lease Agreements. ECF No. 30, at ¶ 53. Additionally, by complaining that the Pest Fee exceeds the actual cost of the pest control services (*id*., at ¶¶ 53–54), Plaintiffs concede that those services were provided. In fact, Plaintiffs complain about the the scope and method of pest control services themselves. *Id*., at ¶¶ 56–57 (complaining that the pest control providers do not actually spray pesticides inside the apartments themselves); *id*., at ¶ 59 (complaining that the pest control vendor did not treat for pests inside the Filali's unit).[9]

Plaintiffs also add new allegations to suggest that Pegasus did not provide pest control services *after* Plaintiffs' signed the Lease Agreements. Those allegations are irrelevant for purposes of the VCPA. What matters is Pegasus's statements and intent ***at the time of contracting***. Even if Pegasus failed to provide the promised pest control services at a later date (a fact it does not concede for the reasons stated above), that would not establish that Pegasus lacked the ***intent*** to provide pest control services when it signed Plaintiffs' Lease Agreements. Failing to perform a contractual duty after signing the contract might support a claim for breach of contract, but not a claim under the VCPA.

In any event, Plaintiffs do not plausibly establish that Pegasus failed to provide pest control services. Plaintiffs' complain that they never saw pest control services performed "in their units." ECF No. 30, at ¶¶ 57–59. That is not surprising. Pegasus's contracts with pest control vendors are

---

[9] These fact-intensive complaints about the nature and scope of specific pest control services, at specific facilities, on specific days, and in specific units emphasizes why Plaintiffs' claims are atypical and why this case is not appropriate for class treatment under Rule 23.

clear that many of the pest control services occur outside of the facility at entry points and places where pests are likely to gather. For example, consider Pegasus's contract with the pest control vendor for Glenmoor, which Plaintiffs refer to in their Amended Complaint. *See* Pest Control Contract for Glenmoor Oaks, attached as **Exhibit 4**.[10] The contract states that the pest control provider will place traps and other preventative measures "in close proximity to dumpsters and/or around the ***exterior perimeter*** of buildings[.]" *Id*., at p. 2 (emphasis added). This makes perfect sense. If a vendor can prevent pest infestations by focusing on the exterior of the building without barging into an apartment and potentially displacing a tenant that is the preferred method for all involved.

In short, Plaintiffs' assertion that they did not see pest control services performed ***in their units*** does not establish that Pegasus failed to provide the requisite pest control services at the apartment complex to prevent pest problems in the complex as a whole or in Plaintiffs' apartments. Notably, while Plaintiffs complain that they never saw pest control services performed in their units, they do not allege any facts to suggest that there was an actual pest issue in their apartment complexes or in their units. Even if they did, those allegations would not establish that Pegasus

---

[10] The Court may take judicial notice of Pegasus's contract with Bug Busters for Glenmoor Oaks. *Skochin v. Genworth Life Ins. Co.*, 413 F. Supp. 3d 473, 480 (E.D. Va. 2019) ("The Court can take judicial notice of matters of public record, and it can consider documents attached to the complaint and motions to dismiss "so long as they are integral to the complaint and authentic.") (citation omitted). Plaintiff expressly invokes this pest control contract—and others—in its Amended Complaint and alludes to the terms of that contract. *See* ECF No. 30, at ¶¶ 53–54. Plaintiffs allege that Pegasus is aware of the costs of pest control services by virtue of this contract and chooses to assess a Pest Fee that exceeds the actual costs of the service. *Id*., at ¶ 53; *id*., at ¶ 54 (making this specific allegation about Pegasus's contract for pest control services at Glenmoor Oaks). Therefore, this contract is integral to the claims and allegations in Plaintiffs' Amended Complaint. There is no dispute about authenticity as Pegasus produced this contract to Plaintiffs before Plaintiffs filed their Amended Complaint, and Plaintiffs expressly rely upon its existence and terms in stating the claims in that amended pleading.

misrepresented anything about the nature of the Pest Fee when it executed the Lease Agreements with Plaintiffs.

### d.    Plaintiffs cannot contest the amount or reasonability of the Pest Fee.

In another new addition to the Amended Complaint, Plaintiffs complain that the Pest Fees were "significantly more" than the actual costs of the pest control services performed at Pegasus's facilities. ECF No. 30, at ¶¶ 53–56. Though Plaintiffs now have Pegasus's contracts with pest control companies and claim to know the costs of those pest control services (*id*., at ¶¶ 53–55), they fail to offer any facts or figures to substantiate this alleged discrepancy. They simply conclude that the "actual costs" of pest control services at Pegasus's facilities were "far less" than the "revenue generated" by the Pest Fee. *Id*., at ¶ 55.

These fact-fee conclusions aside, Plaintiffs bargained away their right to contest the reasonability of the Pest Fee when they signed the Lease Agreements. The Utility Addendum is clear that when the landlord allocates the costs of a service through a monthly flat fee, the tenant "agree[s] that the charges . . . represent a fair and reasonable amount for the service(s) provided and that the amount billed is not based on a monthly per unit cost." Exh. 1, at p. 11; Exh. 2, at p. 13, Exh. 3, at p. 69.

The Lease Agreement provides several options for the landlord to choose from when allocating the costs of such services. *Id*. Several of those allocation methods would bind the landlord to calculate actual usage of the service (such as water), or allocate the costs of the service based on the number of tenants in a unit, the size of the unit, the number of bedrooms in a unit, etc. *Id*. The flat fee option does not. It is simply a per-tenant flat fee for the service that the landlord and the tenant agree is fair and reasonable when they sign the Lease Agreement. *Id*.

Additionally, none of the other allocation methods binds the landlord to assess the actual cost of the service—let alone on a per-unit or per-tenant basis. Indeed, the Utility Addendum states that any "allocation method may or may not accurately reflect total utility consumption" or that tenants may be covering the costs of providing the service "in common areas or in other residential units." *Id*. Nonetheless, like the flat fee, the landlord and the tenant agree that the method used for "estimating total utility consumption is fair and reasonable." *Id*.

In sum, Plaintiffs bargained away their right to challenge the reasonableness or fairness of the Pest Fees. Even if they could challenge whether the amount of the fees was appropriate, that would not make their Lease Agreements false. Those agreements are clear that the landlord is ***not*** attempting to tie the Pest Fee to the actual cost of the pest control services on a per-unit basis. Rather, they state that the landlord is proposing a monthly Pest Fee, which, by signing the Lease Agreement, the tenant concedes is fair and reasonable.

### 2.    <u>The Administration Fee.</u>

Plaintiffs contend that their Lease Agreements "do not contain any provision for charging [the Administration Fee] or an explanation of what it was for." ECF No. 30, at ¶¶ 31, 39, 60. However, that fee was disclosed in Plaintiffs' lease applications. Those applications, which Plaintiffs signed, state that there would be "a leasing administration fee of [$250.00 (Rios) and $300 (Filali)] due upon lease execution." Exh. 1, at p. 37; Exh. 3, at p. 4. Plaintiffs do not allege anything false or misleading in that disclosure. They do not allege, for instance, that Pegasus charged them more than the amounts disclosed in the lease applications. In short, they do not allege a VCPA violation concerning the Administration Fee.

**B.**    **Plaintiffs' VCPA claim is barred by Virginia Code Ann. § 59.1-199(5).**

While the VCPA is a broad remedial statute, the General Assembly saw fit to carve out certain exemptions to the statute's private right of action. One of those exemptions applies when a claim concerns "[a]ny aspect of a consumer transaction that is subject to the Virginia Residential Landlord and Tenant Act[.]" Va. Code Ann. § 59.1-199(5).

Unfortunately, the VCPA does not define the phrase "subject to the Virginia Residential Landlord Tenant Act." *Id*. But that meaning is not difficult to ascertain. "'Subject to' means 'subordinate, subservient, inferior, obedient to; ***governed or affected by***." *Va. Elec. & Power Co. v. State Corp. Comm'n*, 810 S.E.2d 880, 884 (Va. 2018) (quoting *Donnelly v. Donatelli & Klein, Inc.*, 519 S.E.2d 133, 138 (Va. 1999) (quoting Black's Law Dictionary 1425 (6th ed. 1990))) (emphasis added). The question is whether Plaintiffs' VCPA claim against Pegasus concerns "any aspect of a consumer transaction" that is "governed or affected by" the VRLTA. It does.

The purpose of the VRLTA is "to simplify, clarify, modernize and revise the law governing the rental of dwelling units and the rights and obligations of landlords and tenants[.]" *Isbell v. Commercial Inv. Assocs.*, 273 Va. 605, 615, 644 S.E.2d 72, 76 (2007) (citation omitted). The Act codifies the rights, obligations, restrictions, and remedies for landlords and tenants alike. *Id*., at §§ 55.1-1214 through 1259; *see also Steward v. Holland Family Props., LLC*, 726 S.E.2d 251, 253 (Va. 2012) (stating that landlords offering residential leases are "subject to the VRLTA."); *see also Copperpen, LC v. Gioscio*, 99 Va. Cir. 286, 291 (Clarke Cnty. Cir. Ct. 2018) (finding that the VRLTA "governs the rights and obligations of the parties in the context of this landlord/tenant relationship."). This includes the rights and obligations in the statutory warranty of habitability. Va. Code Ann. § 55.1-1220. The Act also governs residential lease agreements and provides

guidelines and prohibitions applicable to those agreements. *See e.g.*, Va. Code Ann. §§ 55.1-1204 through 1213; *see also Sweeney v. West Group, Inc.*, 527 S.E.2d 787, 788–89 (Va. 2000).

When a tenant claims that a lease provision is invalid under the Act, a court necessarily looks to the provisions of the VRLTA to assess the claim. Thus, when a tenant challenges a provision of her residential lease, both the lease and her claim are "subject to" the Act. *See e.g.*, *Sweeney v. West Group, Inc.*, 527 S.E.2d 787, 788–89 (Va. 2000). That is the case here.

Plaintiffs seek damages "for Defendants' violations of the Virginia Residential Landlord Tenant Act . . . and the [VCPA]." ECF No. 30, at ¶ 1. They specify that their "claims stem from" Defendants' decision to charge tenants the Pest, Community, and Administrative Fees. *Id*., at ¶ 2. Plaintiffs repeatedly invoke the VRLTA to declare those fees illegal. *Id*., at ¶¶ 4, 42, 71-72, 83, 96–97, 102–103, 111–12. They claim that those fees violate the VRLTA and "induce[ ] [Defendants'] tenants into a residential lease that misrepresents their rights to certain services related to the warranty of habitability—***guaranteed under Virginia law***—and forces them to waive such rights." *Id*., at ¶ 8 (emphasis added). That guarantee exists only by virtue of the VRLTA.

The warranty of habitability did not exist at common law in Virginia. *Federico v. Lincoln Military Hous., LLC*, No. 2:12cv80, 2013 U.S. Dist. LEXIS 138613, at *25 (E.D. Va. Sep. 25, 2013) (noting that the implied warranty of habitability did not exist at common law in Virginia) (citations omitted); *Guy v. Tidewater Inv. Props.*, 41 Va. Cir. 218, 229 (Norfolk 1996) (same) (citations omitted). It is a creation of the VRLTA. *See* Va. Code Ann. § 55.1-1220; *Guy*, 41 Va. Cir. at 229 ("Thus, a warranty of habitability exists under the VRLTA."). Since the warranty at the heart of Plaintiffs' claim *exists only by virtue of the VRLTA*, Plaintiffs' claim concerning that warranty is "subject to" the VRLTA.

Plaintiffs invoke Section 59.1-199(5) of the VCPA, which states that while the VCPA does not apply to "[a]ny aspect of a consumer transaction that is subject to the Virginia Residential Landlord and Tenant Act" there is an exception if the "act or practice of a landlord constitutes a misrepresentation or fraudulent practice under [the VCPA]." *Id*. While Plaintiffs offhandedly invoke this exception, they fail to qualify for it. As discussed above, Plaintiffs fail to identify any misrepresentations, concealments, or other fraudulent practices in the Lease Agreements. Accordingly, Plaintiffs cannot avoid the general exemption in the VCPA for claims "subject to" the VRLTA. Plaintiffs' claim that fees disclosed in their Lease Agreements violate the statutory warranty of habitability *found only in the VRLTA* is just that species of claim. Therefore, the VCPA claim in Count I is barred.

## CONCLUSION

Accordingly, the Court should grant Pegasus's Motion to Dismiss and dismiss Plaintiffs' VCPA claim in Count I of the Amended Complaint, with prejudice.

Dated: September 24, 2025                    Respectfully Submitted,


By:    */s/ C. Quinn Adams*
James W. Walker (VSB #29257)
C. Quinn Adams (VSB #90506)
Melisa Azak (VSB #98089)
O'HAGAN MEYER
411 East Franklin Street, Suite 500
Richmond, VA 23219
jwalker@ohaganmeyer.com
dfinberg@ohaganmeyer.com
cadams@ohaganmeyer.com
mazak@ohaganmeyer.com
Facsimile: (804) 237-0250
Telephone: (804) 403-7125

and

Dana J. Finberg (VSB #34977)
O'HAGAN MEYER
One Embarcadero Center, Suite 2100
San Francisco, CA 94111
dfinberg@ohaganmeyer.com
Facsimile: (415) 578-6910
Telephone: (415) 578-6902
*Counsel for Pegasus Residential, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of September, 2025, the foregoing was electronically filed with the Clerk of Court using the CM/ECF System, which will send a notification of such filing to all authorized users.

*/s/ C. Quinn Adams*

## <u>CERTIFICATION CONCERNING ARTIFICIAL INTELLIGENCE</u>

1.      I hereby certify that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2.      I hereby certify that every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

<i>/s/ C. Quinn Adams</i>