IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| MARIA CAMILA VALENCIA RIOS, AQUARIUS FILALI, and NADJI FILALI, *on behalf of themselves and all similarly situated individuals*, <br><br> Plaintiffs, <br><br> v. <br><br> BELVEDERE NRDE, LLC, PEGASUS RESIDENTIAL, LLC, and GLENMOOR OAKS NRDE, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 3:25-cv-474-REP-MRC |

**PLAINTIFFS' OPPOSITION TO DEFENDANT PEGASUS RESIDENTIAL, LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

This case concerns the rising trend of landlords and property managers (like Defendants here) charging so-called "junk fees" to tenants for services that they are already obligated to provide under state law and that they intentionally conceal. These junk fees—charged to tenants across the Commonwealth—serve as a major profit generator. Landlords and property managers engage in these schemes to increase their profits while advertising their units at a lower rental price, thereby luring unsuspecting consumers into leases packed with additional fees for services rental payments are already supposed to guarantee. As multiple reports have now found, this practice has only compounded the rent burden on low- and middle-income Americans, depriving them of the financial mobility needed to advance up the socioeconomic ladder.[1] These additional fees have also compounded the eviction crisis.

---

[1] *See Federal Data Shows Many Virginians are 'Rent Burdened'*, Va. Public Radio (Sept. 24, 2025), https://www.wvtf.org/news/2025-09-24/federal-data-shows-many-virginians-are-rent-burdened (reporting based on federal data that "four out of 10 people who are renting in Virginia

In this case, Plaintiffs challenge three fees charged and collected by Defendants: (1) a pest control fee of $9 per month for Plaintiff Valenica and $6 per month for the Filalis (the "Pest Fee"); (2) a so-called "community fee" of $34 per month for Plaintiff Valencia and $28 per month for the Filalis that is supposed to cover "oversight of potential and current amenities, building maintenance, and all programs deemed necessary by ownership and management . . ."; and (3) a move-in fee—also called an "administration fee" in the tenant ledgers—of $250-300 that Defendants required all Plaintiffs and their tenants to pay at the time of move-in and that has no apparent beneficial purpose for any of the tenants in the defined classes (the "Move-In Fee").[2] Plaintiffs challenge these fees on behalf of similarly situated tenants at their respective apartment complexes and other Virginia properties managed by Defendant Pegasus Residential, LLC ("Pegasus"), alleging that the fees are deceptive and unlawful under the Virginia Consumer Protection Act ("VCPA") and Virginia Residential Landlord Tenant Act ("VRLTA").

The Disputed Fees are deceptive for three reasons: First, the Pest Fee and Community Fee are deceptive insofar as Plaintiffs' and the class members' respective landlords are already obligated by Virginia law to provide fit and habitable living quarters, including pest-free premises and properly maintained common areas. The Court of Appeals of Virginia has already found in a published decision that the warranty of habitability that includes the right to a pest-free premises cannot be shifted to the tenant. *See Parrish v. Vance*, 898 S.E.2d 407, 411–14 (Va. Ct. App. 2024) (holding that a landlord could not shift the burden of satisfying the obligations imposed by the warranty of habitability in Va. Code § 55.1-1220(A) to their tenants). The same warranty of

---

cannot realistically afford their rent" and describing Virginia's "outsized eviction rate"); *see also Nearly Half of Renter Households are Cost-Burdened, Proportions Differ by Race*, U.S. Census Bureau (Sept. 12, 2024), https://www.census.gov/newsroom/press-releases/2024/renter-households-cost-burdened-race.html (last visited Oct. 1, 2025)

[2] All three fees are referenced herein as the "Disputed Fees."

habitability that the Court of Appeals in *Parrish* found could not be shifted onto tenants requires the Landlord Defendants to provide safe and habitable common spaces (i.e., the very costs supposedly covered by the Community Fee). *See* Va. Code § 55.1-1220(A)(3) (requiring landlords to "[k]eep all common areas shared by two or more dwelling units . . . in a clean and structurally safe condition"). It was thus deceptive for Defendants to represent to Plaintiffs and the putative class that they could collect the Pest Fee and Community Fee for services that they were already obligated to provide under Virginia law as an express warranty under their lease agreements.

Second, regardless of their legality under the warranty of habitability, Plaintiffs also challenge the Pest Fee and Community Fee as deceptive under the VCPA based on Defendants' misrepresentation of and failure to disclose the true purpose of such fees, which was to generate profit for Defendants. Indeed, as discovery has confirmed, although affirmatively representing in Plaintiffs' lease agreements that the Pest Fee merely covers the "bills" charged to Defendants by their pest control vendors, Defendants are in fact recouping ***$14,000 and $28,000 in profit*** off of the Pest Fee at Plaintiffs' two apartment complexes, alone. Considering the other properties in Virginia managed by Pegasus, the Pest Fee is a significant profit generator for Defendants, which they have known to be the case since before Plaintiffs signed their leases but chose not to disclose to them or any of their co-tenants. The same is true of the Community Fee, which discovery has thus far confirmed does not in fact cover the services Defendants claim it covers, such as building maintenance and amenities, but instead covers insurance for Defendants that guarantees them rental income for unrented units. In other words, by paying the Community Fee, Plaintiffs and the tenants are paying the insurance premiums for Defendants to guarantee their own profits. This deception provides a second, independent basis for Plaintiffs' VCPA claims.

Finally, Plaintiffs challenge the $250-300 Move-In Fee as deceptive, because there is no basis to charge the fee under Plaintiffs' lease agreements or Virginia law. Defendants only response to this is to argue that it was disclosed in Plaintiffs' lease applications, but that raises additional issues. For one, the fee disclosed in the lease applications is supposed to be paid at the time of lease signing, yet Defendants charge and collect the Move-In Fee after the tenants have moved in. But there is no mention of it in the lease nor is it permitted under Virginia law. Since it is not part of the lease, to the extent the fee is tied to the application, it would be an end-run around Virginia's cap on application fees at $50 and prohibition on non-refundable move-in fees, and thus unlawful and deceptive for this separate reason. *See* Va. Code § 55.1-1203(C) (limiting application fees to $50 and only permitting ***refundable*** application deposits in certain circumstances).

In response, Pegasus has filed a motion to dismiss Count One of the First Amended Complaint (the only claim against it), but each argument it raises lacks merit. For example, Pegasus argues that *Parrish* is limited only to instances in which the tenant is required to provide their own pest control, not, as here, when the landlord provides the pest control services and the tenant pays for it. But *Parrish* held that lease agreements cannot shift "***the burden*** to deal with insect infestations" or other obligations under the warranty of habitability to the tenant. Requiring tenants to pay for their own pest control or common area maintenance does precisely that—it shifts "the burden" of maintaining safe and habitable premises from the landlord to the tenant, in direct contravention of *Parrish* and Virginia law. As Pegasus's other arguments are similarly unavailing, and as there are multiple, plausible misrepresentations of fact in this case that stand independently of each other, Pegasus's motion to dismiss should be denied.

## I. BACKGROUND

On September 3, 2025, Plaintiffs filed their First Amended Class Action Complaint against Defendants[3]—Plaintiffs' landlords and apartment management company at their respective complexes—seeking relief for their imposition of deceptive and unlawful junk fees. (*See generally* Am. Compl., ECF No. 12.) The Amended Complaint asserts two counts under the VCPA (Counts One and Three) and one count under the VRLTA (Count Two). Relevant here, Count One asserts a claim against Pegasus for misrepresenting the nature and purpose of the Pest Fee and Community Fee, as well as imposing and collecting the Move-In Fee that it was not authorized to collect under the lease or Virginia law.

### A. Defendants' Fees

Plaintiffs' claims stem from Defendants decision to collect three fees that they had no basis in law or Plaintiffs' lease agreements to collect. (Am. Compl. ¶¶ 2-6.)

First, Defendants have imposed a monthly Pest Fee, which is $9 per month at Plaintiff Valencia's apartment complex and $6 per month at the Filalis' complex. (*Id.* ¶¶ 27-28, 36-37.) According to Plaintiffs' and the class members' lease agreements, the purpose of the Pest Fee is to cover "bills . . . billed by the service provider to us and then allocated to you [each tenant]." (*Id.* ¶¶ 28, 37.) As alleged in the Complaint, however, this representation is not true, as the actual cost to Defendants of providing the pest control services is far less than the total amount they collect from their tenants each month through the Pest Fee—a fact confirmed by the document production in this case to date, which includes the contracts and invoices for the pest control vendors and demonstrates that the rates charged to Defendants are less than the amounts collected by them at

---

[3] Defendants Belvedere NRDE, LLC and Glenmoor Oaks NRDE, LLC are referred to collectively herein as the "Landlord Defendants," while Defendant Pegasus Residential, LLC is referred to as "Pegasus."

each complex.  (*Id.* ¶¶ 52-55.)  Nor have Plaintiffs received notice of any pest control services being provided directly to their units, even though their lease agreements require such notice, which confirms that there have been no pest control services within their units despite the monthly charge to them.  (*Id.* ¶¶ 56-58.)  In fact, the Filalis submitted a request for pest control services in their unit, but Pegasus marked the request as resolved without any pest control vendor ever coming into the Filalis' unit.  (*Id.* ¶ 59.)  And as detailed in the Complaint, Defendants' representation that they can collect the Pest Fee is itself an independent misrepresentation, because Virginia law proscribes landlords from shifting to tenants the burden of maintaining a pest free premises (or any other guarantee of the warranty of habitability under Va. Code § 59.1-1220).  (Id. ¶¶ 42-44, 75.)

  Second, for the two years prior to filing the Complaint, Defendants started assessing at all of Pegasus's Virginia properties a so-called "Community Fee," which Defendants' leases represented would be allocated to "the oversight of potential or current amenities, building maintenance, and all programs deemed necessary by ownership and management and applicable to you . . . ."  (Am. Compl. ¶¶ 29, 38.)  However, the Community Fee was itself an unlawful and deceptive attempt by Defendants to shift the burden of maintaining common spaces to their tenants.  (*Id.* ¶¶ 45-50, 75.)  As with the Pest Fee, moreover, Defendants also misrepresented the purpose of the Fee, which was not to provide funds for amenities, building maintenance, or other "programs . . . applicable" to the tenants, but rather to generate additional profit for Defendants.  (Id. ¶¶ 52, 73-74.)  In fact, discovery has thus far confirmed that the Community Fee does not cover any programs for tenants or even building maintenance but is solely allocated to paying premiums for Defendants' own lease insurance coverage that guarantees them rental income from unlet units each month.

Finally, Defendants have assessed and collected from Plaintiffs a so-called "Move-In Fee"—also referred to as an "Administration Fee" on their tenant ledgers—of $250 and $300, respectively, at Plaintiffs' apartment complexes. (Am. Compl. ¶¶ 26, 31, 35, 39.) But there is nothing in Plaintiffs' lease agreements that authorizes the charging and collection of this fee, and Plaintiffs therefore allege that Defendants' representation that the Fee is due and owing is deceptive. (*Id.* ¶¶ 60, 77.) As further discovery has now confirmed, this Fee also appears to be an unlawful lease application fee above the limit set by the VRLTA, adding to its deceptive nature. *See* Va. Code § 59.1-1212 (capping application fees at $50 exclusive of actual costs and only permitting certain refundable fees to secure a unit).

### B. Plaintiffs' Claims

Plaintiffs assert three counts against Defendants.

First, in Count One, Plaintiffs assert a claim against Pegasus under the VCPA on behalf of a class of all tenants who executed a lease at a Pegasus property in Virginia and had to pay the Disputed Fees. (Am. Compl. ¶ 65.) This claim seeks relief against Pegasus for misrepresenting that the nature and purpose of the Disputed Fees, including (1) that it could collect the fees and (2) the purpose and use of the fees. (*Id.* ¶¶ 71-86.)

Count Two asserts a claim against the Landlord Defendants under the VRLTA for a class of all tenants at the Landlord Defendants' respective properties. (*Id.* ¶ 88.) Specifically, Count Two alleges that the Landlord Defendants violated Va. Code § 55.1-1220 by demanding and accepting payment for pest control and the maintenance of common areas that were their sole burden to provide under Virginia's warranty of habitability. (*Id.* ¶¶ 94-103.)

Finally, Count Three alleges a claim under the VCPA on behalf of all tenants who executed a lease with the Landlord Defendants and were required to pay any of the Disputed Fees. (*Id.* ¶

105.) Count Three asserts the same misrepresentations as Count One, but against the Landlord Defendants. (*Id.* ¶¶ 111-125.)

In response to these claims, Defendants filed separate motions to dismiss (ECF Nos. 37, 41) raising largely the same arguments. As detailed below, each of Defendants' arguments is unavailing, and their motions should be denied entirely.

## II.   ARGUMENT

### A.   Legal Standard

Rule 12(b)(6) tests the sufficiency of a complaint; "it does not serve as the means by which a court resolves factual contests, determines the merits of a claim or addresses potential defenses." *Hill v. Nationstar Mortg. LLC*, No. 3:22-cv-108, 2022 WL 16950025, at *3 (E.D. Va. Nov. 15, 2022) (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). "In considering a motion to dismiss, the Court accepts the plaintiff's well-pleaded allegations in the complaint as true and views the facts in the light most favorable to the plaintiff." *Id.* (citing *Mylan Lab'ies, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The factual allegations in a complaint "must be enough to raise the right to relief above the speculative level," rendering the right "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### A.   Plaintiffs Have Stated a Plausible VCPA Claim in Count One

Pegasus argues that Plaintiffs have failed to allege a VCPA claim against it because (1) there are no affirmative misrepresentations of present fact on which the claim is based; and (2) the conduct is exempted by Va. Code § 59.1-199(5). (Pegasus Br., ECF No. 42 at 10-24.) As detailed below, however, each of these arguments fails under the plausible allegations of the complaint, and Pegasus's motion should be denied.

8

### *1.  Plaintiffs have alleged multiple, independent misrepresentations, each of which gives rise to a VCPA claim.*

To establish a VCPA claim, the plaintiff must show (1) a misrepresentation of fact; (2) reliance by the plaintiff; and (3) damages. *In re Lumber Liquidators Litig.*, No. 1:16-md-2743, 2017 WL 29111681, at *12-13 (E.D. Va. July 7, 2017). Pegasus challenges only the first element, so Plaintiffs focus on that element here.

As detailed above, Plaintiffs' claim against Pegasus in Count One is based on multiple misrepresentations, including:

(1) misrepresenting that Pegasus could collect the Pest Fee and Community Fee, when in fact the Fees could not be passed on to Plaintiffs' and the putative class members under Virginia's warranty of habitability (Am. Compl. ¶¶ 42-50, 75);

(2) misrepresenting that the Pest Fee would be used to cover "bills . . . billed by the service provider to us and then allocated to you [each tenant]," when in fact the Fee was a profit generator for Defendants and the pest control services were not provided and were never intended to be provided at the charged rate (*Id.* ¶¶ 52-61);

(3) misrepresenting that the Community Fee would be used for "the oversight of potential or current amenities, building maintenance, and all programs deemed necessary by ownership and management and applicable to you . . . .," when in fact it was used to generate additional income for Defendants, including, as recently confirmed through discovery, to cover the premium for Defendants' own rental income insurance that served no beneficial purpose to Plaintiffs or their co-tenants (*Id.* ¶¶ 52, 73-74); and,

(4) misrepresenting that the Move-In Fee could be collected when in fact it was not authorized by any provision in Plaintiffs' lease agreements or Virginia law (*Id.* ¶¶ 60, 77).

Plaintiffs address each misrepresentation and Pegasus's arguments, in turn.

                *i.*      *Defendants misrepresented that they could collect the Pest Fee and Community Fee under Virginia law.*

Pegasus first argues that it could collect the Pest Fee and Community Fee under Virginia law without waiving the guarantees of the warranty of habitability, and thus there was no misrepresentation of this fact. (Pegasus Br. at 10-16.) Pegasus argues that the Court of Appeals of Virginia's holding in *Parrish* was simply that it could not wholly disclaim its obligations under the warranty of habitability in the lease agreements themselves, which it argues were not waived through the imposition of the Pest Fee and Community Fee. (*Id.*) But Pegasus's argument is unsupported by the plain language of the decision. It should be rejected.

*Parrish* arose from a landlord's appeal of a ruling in favor of a tenant terminating a lease and refunding rental payments after the landlord—Parrish—failed to adequately abate a flea infestation at his rental property. 898 S.E.2d at 432-35. On appeal, the landlord argued that the lease imposed on the tenant the obligation to maintain a pest-free premises and thus the tenant could not terminate the lease on this basis. *Id.* at 435-36. The Court of Appeals of Virginia disagreed, finding that the VRLTA explicitly prohibits landlords from using lease provisions that "'waive or forgo rights or remedies under this chapter'" and that such provisions are "'unenforceable.'" *Id.* at 436 (quoting Va. Code § 55.1-1208). Thus, the Court found, "when a lease provision purports to waive tenant's rights or remedies required by law, the law controls and the lease provision is unenforceable." *Id.*

Applying this reasoning, the Court found that the provisions of Va. Code § 55.1-1220(A) impose unwaivable obligations on landlords to maintain safe and habitable premises, including keeping the premises pest-free. *Id.* at 437. To support this holding, the Court cited the requirement under Va. Code § 55.1-1220(A)(1) that the "landlord shall . . . [c]omply with the requirements of applicable building and housing codes materially affecting health and safety," as well as the

10

express requirement of § 55.1-1220(A)(2) that the landlord "[m]ake all repairs and *do whatever is necessary* to put and *keep the premises in a fit and habitable condition*." *Id.* (emphases supplied). These provisions, the court held, meant that the landlord was obligated to make "premises . . . livable, free from serious defects to health and safety, and have necessary qualities for habitability," including being free from infestations. *Id.* at 438.

The Court did not limit its holding to only pest control, either. To the contrary, it explicitly held that "[t]he warranty of habitability provided in Code § 55.1-1220(A) is not waivable." *Id.* In other words, **all of the subsections** of 55.1-1220(A) comprise the warranty of habitability that cannot be waived through lease provisions. *Id.* Thus, the Court of Appeals held, "Code § 55.1-1220(A) provides tenants a warranty of habitability that a landlord and tenant cannot waive by agreement," including through "attempt[s] to **shift the burden** to deal with insect infestations to [the tenant]." *Id.* at 440 (emphasis added).

Contrary to Pegasus's argument, *Parrish* not only prohibits the wholesale waivers of landlords' duties under the warranty of habitability enumerated in § 55.1-1220(A), but by its plain language, also prohibits landlords from waiving the warranty's guarantees through any "attempt[] to shift the burden" from the landlord to the tenant. To be sure, shifting the burden to do the manual labor of maintaining a pest free premises is one such impermissible waiver. But charging the tenant for the cost of such services is another. Indeed, even in *Parrish*, the issue was not whether the tenant could be made to do the manual labor of treating the flea infestation; it was which party was responsible *for paying third-party vendors to do the work*. *See* 898 S.E.2d at 432-433 (detailing landlord and tenant's efforts to treat flea infestation through hiring and paying for pest control vendors to fumigate and treat the property).

11

Notably, other courts have similarly found that a landlord cannot impermissibly shift its statutory obligations to a tenant through the shifting of the financial costs. *See, e.g.*, *De Stefano v. Apts. Downtown Inc.*, 879 N.W.2d 155, 183 (Iowa 2016) (finding under Iowa's warranty of habitability that landlord could not charge tenants for repairs that it undertook to maintain fit and habitable premises).

These rulings make practical sense, for if a landlord is prohibited only from shifting the burden of doing the work of maintaining a fit and habitable premises to the tenant but can still shift the cost, then the landlord really is under no obligation at all, as the guarantees of the warranty of habitability largely relate to issues—such a pest control, building maintenance, HVAC, electricity, and plumbing—that landlords and property managers are not realistically undertaking in any event, but are hiring third party specialists to perform. If landlords can still shift these costs to their tenants while also charging them rent that is supposed to guarantee the tenants a fit and habitable premises under Virginia law, then landlords will effectively escape the actual obligations they are supposed to undertake on behalf of their tenants.

As *Parrish* recognized, Virginia law is explicit that landlords cannot escape their statutory obligations through lease provisions. The Pest Fee and Community Fee here both shift to tenants obligations that are already guaranteed by the statutory warranty of habitability. *See* § 55.1-1220(A)(2) (requiring landlords to "[m]ake all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition"); § 55.1-1220(A)(3) (requiring landlords to "[k]eep all common areas shared by two or more dwelling units of a multifamily premises in a clean and structurally safe condition"). As in *Parrish*, therefore, the imposition of these fees is unlawful under the VRLTA, and Defendants representation that it could collect them is a

misrepresentation of present fact that gives rise to a VCPA claim in Count One.  Pegasus's motion to dismiss this portion of Count One should thus be denied.

      *ii.* *Defendants misrepresented that the use and purpose of the Pest Fee and Community Fee.*

Regardless of whether Defendants could assess the Pest Fee or Community Fee, Defendants also made the independent misrepresentations of the purpose and use of such fees, namely: that the Pest Fee would cover "bills . . . billed by the service provider to us and then allocated to you [each tenant]," and that the Community Fee was for "the oversight of potential or current amenities, building maintenance, and all programs deemed necessary by ownership and management and applicable to you . . . ."  As detailed in the Complaint, these representations were false because both Fees were in fact far higher than the actual costs of these services, as demonstrated through the pest control contracts at Pegasus's Virginia properties.  (Am. Compl. ¶¶ 52-59.)

Consider, for example, the pest control vendor contract that Pegasus attached to its Motion (ECF No. 42-4), which shows that for the Filalis' complex (Glenmoor Oaks), Pegasus and Glenmoor paid the vendor only $3,874.00 for a year's worth of treatments for the past two years. (ECF No. 42-4 at 5.)  Yet, Pegasus and Glenmoor collected $1,488 a month from the tenants at Glenmoor Oaks (248 units x $6-per-month pest fee), totaling $17,856 per year.  That equates to a $13,982 annual profit for just one of Pegasus's Virginia properties.  At Plaintiff Valencia's complex, the Belvedere, the annual profit from the Pest Fee is approximately $28,000.[4]

---

[4] The pest control vendor at The Belvedere charges $2,470.00 for a year of treatments and $1,483.00 for termite treatment, while Belvedere tenants pay $2,664 per month, or $31,968 per year, in pest fees—a $28,000 annual profit.  *See* Ex. 1 (Pegasus_000353-360).

Similarly, Defendants' representation regarding the use of the Community Fee was also deceptive because it in fact covered uses other than building maintenance and amenities. As discovery has shown, the Fee was equal to the amount of Defendants' premiums for rental income insurance, meaning tenants paid Defendants for the privilege of Defendants having guaranteed income for unlet units without Defendants having to pay the premiums themselves. This use of the Fee for Defendants' own profit is far from the "oversight of potential or current amenities, building maintenance, and all programs deemed necessary . . . and applicable to you" that Defendants' leases represented was the purpose of the Community Fee.

Pegasus's only response is to argue that Plaintiffs have failed to identify specific misrepresentations of present fact, dismissing Plaintiffs as merely having a "quibble" about the uses of each fee. (Pegasus Br. at 16-17.) However, the Amended Complaint clearly identifies the specific, affirmative misrepresentations made by Defendants in Plaintiffs' and the class members' lease agreements, ***directly quoting the statements*** from the leases. (*See* Am. Compl. ¶¶ 28-29 (quoting language that Pest Fee would be used to cover "bills . . . billed by the service provider to us", 37-38 (quoting language that Community Fee would be used for ""the oversight of potential or current amenities, building maintenance, and all programs deemed necessary by ownership and management and applicable to you . . . ."). Far from the "vague" "quibbles" that Pegasus describes, these statements are explicit, affirmative claims about the use of each Fee—claims that are demonstrably false, as confirmed through discovery to date.

Indeed, a court in this District has denied a motion to dismiss claims based on affirmative misrepresentations in a lease agreement as to the use and purpose of tenant fees, including because the fees in fact generated an undisclosed profit—the same allegations asserted here. *See Blanco v. Leesburg Manor Owner, LLC*, No. 1:24-cv-1045, ECF No. 24 (E.D. Va. Sept. 20, 2024) (Hilton,

14

J.) (denying motion to dismiss VCPA claims against landlords and property manager based on alleged misrepresentation as to the use of a "Media Fee" in lease agreement when the fee was alleged to in fact be a profit generator). And other courts have found similar allegations to be sufficient to establish unfair and deceptive trade practices claims. *See, e.g.*, *Heartland Payment Sys. v. Mercury Payment Sys.*, 2015 WL 3377662, at *3-8 (N.D. Cal. Feb. 24, 2015) (finding allegations that additional fees were marked up by the defendant while the defendant represented to customers that it was simply passing on charges from third parties established false advertising claim under Lanham Act, as well as claims for unfair and deceptive business practices under California law); *see also Monterey Bay Mil. Housing, LLC v. Ambac Assurance Corp.*, 531 F.Supp.3d 673, 692-93, 702-03 (S.D.N.Y. 2021) (finding that the plaintiffs had alleged affirmative misrepresentations based on allegations that the defendants secretly profited off loan rates while representing that they were set at the market rate).

Pegasus's alternative argument—that Plaintiffs have failed to allege that it lacked a present intent to provide the services as promised at the time the leases were signed—also falls flat. Pegasus conveniently leaves out the entirety of Paragraph 61 of the Amended Complaint when making the argument that Plaintiffs have failed to allege that they never intended to provide the promised services. (Pegasus Br. at 17.) Omitted from Pegasus's cherrypicked quote is the remainder of the allegation that Defendants "did not intend—and never intended at the time they had Plaintiffs and the class members execute their lease agreements—to provide the promised services ***for the amount they charged***." (Am. Compl. ¶ 61 (emphasis added).) As detailed in the Complaint, Defendants never intended to provide pest control or the services promised by the Community Fee at the amounts charged—contrary to their explicit representations that the fees would merely cover those services.

15

In fact, Defendants knew that the pest control costs would be less than the Pest Fees they collected because they signed contracts with their vendors that outlined those costs ***before*** Plaintiffs and the class members ever signed their leases in the class period (2023-2025). *See* ECF No. 42-4 (showing pest control agreement with $3,874.00 contract price was signed in 2022); Ex. 1 (2021 signature date for initial proposal). Defendants were thus well aware of the actual costs of providing pest control services at the class members' complexes and intentionally chose to charge a higher price. (Am. Compl. ¶¶ 52-61, 73-74.) This, too, constitutes a deceptive misrepresentation of present fact that gives rise to a VCPA claim.

Finally, Pegasus argues that Plaintiffs have waived any right to challenge the reasonableness or amount of the Pest Fee by signing the Utility Addendum agreeing that the "charges . . . represent a fair and reasonable amount for the service(s) provided." (Pegasus Br. at 20.) But this ignores that the tenants agreed that these Pest Fee was reasonable ***based on the affirmative representation*** by Defendants in the same Utility Addendum that the Fee merely covered ""bills . . . billed by the service provider to us and then allocated to you [each tenant]." This representation was false, as the pest control contracts and invoices produced by Defendants have now confirmed. Pegasus's attempt to create a contract waiver argument is simply unavailing, as it is premised on the very misrepresentations giving rise to Plaintiffs' claims.

Simply put, regardless of the legality of the Pest Fee and Community Fee under the VRLTA, Defendants are independently liable under the VCPA for their affirmative claims as to the uses and purpose of such fees, which are demonstrably false. Such misrepresentations give rise to VCPA claims, and Pegasus's motion to dismiss this portion of Count One should be denied.

      *iii.*  *Defendants misrepresented that they could collect the Move-In Fee.*

  Finally, Plaintiffs also allege that Defendants misrepresented that they could collect the Move-In Fee of $250-300 per person, as there was no provision in their lease agreements or under Virginia law for the imposition of such a fee. (Am. Compl. ¶¶ 60, 77.) Pegasus's only response is that the Fee was disclosed in Plaintiffs' lease applications, pointing to language in the applications that the Fee would be "due upon lease execution":

> **Leasing Administration Fee and Rental Payment:** There is a leasing administration fee of $250.00 due upon lease execution. In addition to other rent payment provisions/policies, you will be required to make rent payments online using an online payment portal or eMoney order.

(Pegasus Br. at 21.) But the Fee was not charged upon lease execution; it was charged ***after the lease was executed***. The supposed disclosure of the Fee as part of the lease application was therefore still deceptive.

  And to the extent the Move-In Fee was part of the lease application, the Fee would also constitute an unlawful application fee in contravention of the VRLTA—which provides a separate basis to find the assessment of the Fee deceptive. Specifically, Va. Code § 55.1-1203(C) provides that:

> **An application fee shall not exceed $50, exclusive of any actual out-of-pocket expenses paid by the landlord to a third party performing background, credit, or other pre-occupancy checks on the applicant**. However, where an application is being made for a dwelling unit that is a public housing unit or other housing unit subject to regulation by the U.S. Department of Housing and Urban Development, an application fee shall not exceed $32, exclusive of any actual out-of-pocket expenses paid to a third party by the landlord performing background, credit, or other pre-occupancy checks on the applicant.

The VRLTA in turn defines "application fee" as "any nonrefundable fee" paid "for the purpose of being considered as a tenant for a dwelling unit." Va. Code § 55.1-1200. As tenants must agree to pay the Move-In Fee as part of their lease application, they necessarily agree to pay the Fee "for the purpose of being conspired as a tenant of a dwelling unit." Indeed, if tenants, including

17

Plaintiffs, refused to sign the application requiring them to pay the Fee, they would not be considered for a tenancy at all. As the Fee is nonrefundable, it constitutes unlawful application fee far in excess of the statutory cap.[5] Whether deceptive because it was not disclosed in the lease agreement or because it is not permitted by Virginia law, therefore, Pegasus's motion with respect to the Move-In Fee should also be denied.

### B.     Plaintiffs' VCPA Claims are not Barred by Va. Code 59.1-199(5)

Recognizing that Plaintiffs have identified multiple, separate grounds for asserting VCPA claims against it, Pegasus attempts to avoid the VCPA entirely, arguing that the conduct at issue is exempted from the Act by Va. Code § 59.1-199(5). (Pegasus Br. at 22-24). But again, Pegasus cuts off the relevant language from its quotation of the statutory provision, which provides in full that the VCPA excludes:

> Any aspect of a consumer transaction that is subject to the Virginia Residential Landlord and Tenant Act (§ 55.1-1200 et seq.) or Chapter 14 (§ 55.1-1400 et seq.) of Title 55.1, ***unless the act or practice of a landlord constitutes a misrepresentation or fraudulent act or practice under § 59.1-200***.

Va. Code § 59.1-199(5) (emphasis added).

Pegasus conveniently omits the bolded language from its argument, and for good reason. The language is clear that any alleged misrepresentations or fraudulent acts or practices that may be otherwise subject to the VRLTA are not excluded from the VCPA's provisions, including the acts and practices listed under § 59.1-200. Here, as detailed above, Plaintiffs have outlined several misrepresentations that fall under § 59.1-200's prohibited practices, including the prohibition on

---

[5] The VRLTA permits a "refundable application deposit" in addition to the nonrefundable application fee, but as the name suggests, that deposit must be refunded, minus actual expenses, "within 20 days after the applicant's failure to rent the unit or the landlord's rejection of the application." Va. Code § 55.1-1203(A). The Move-In Fee here is not refundable.

18

"using other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction," § 59.1-200(14). (Am. Compl. ¶ 82.)

As Plaintiffs' claims fall squarely within the VCPA's ambit, Pegasus's final argument should also be rejected and its motion denied.

### III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Pegasus's Motion to Dismiss Count One of the Amended Complaint (ECF No. 41) be denied.

> Respectfully submitted,
> **PLAINTIFFS**
>
> By:     */s/ Kristi C. Kelly*
> Kristi C. Kelly, VSB #72791
> Andrew J. Guzzo, VSB #82170
> Casey S. Nash, VSB #84261
> J. Patrick McNichol, VSB #92699
> Matthew G. Rosendahl, VSB #93738
> Kelly Guzzo, PLC
> 3925 Chain Bridge Road, Suite 202
> Fairfax, VA 22030
> (703) 424-7572 – Telephone
> (703) 591-0167 – Facsimile
> Email: kkelly@kellyguzzo.com
> Email: aguzzo@kellyguzzo.com
> Email: casey@kellyguzzo.com
> Email: pat@kellyguzzo.com
> Email: matt@kellyguzzo.com
>
> *Counsel for Plaintiffs*

**CERTIFICATION CONCERNING ARTIFICIAL INTELLIGENCE**

I hereby certify that no artificial intelligence was employed in doing research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg.

I hereby certify that every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

By: ____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, VSB #72791
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com

*Counsel for Plaintiffs*